**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cottonwood Centers Incorporated,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>John B. Klearman, and Sheryl Klearman,<br><br>　　　　Defendants. | No. CIV 18-252-TUC-CKJ<br><br>**ORDER** |

Pending before the Court is the Amended Complaint (Doc. 6) and the Cross-Motion for Declaratory Relief (Doc. 22) filed by Plaintiff Cottonwood Centers, Inc. ("Cottonwood"). Also pending before the Court is the Motion to Dismiss and Compel Arbitration, or, Alternatively, Stay the Action (Doc. 14) filed by Defendants John B. Klearman ("Klearman") and Sheryl Klearman ("the Klearmans").

Oral argument was presented to the Court on October 9, 2018.

*Factual and Procedural Background*

Klearman, a registered securities broker in California, provides investment banking and advisory services in middle market M&A transactions. Some of Klearman's business is operated through Corporate Finance Associates ("CFA"), which is an assumed trade name Klearman licenses from a third party.

In 2008, Cottonwood's Executive Vice President Steven Welch ("Welch") contacted Klearman to ask him to prepare a proposal regarding Klearman's possible assistance to

1 Cottonwood in the sale of all or a portion of Cottonwood's behavioral healthcare company
2 known as Cottonwood Centers, Cottonwood de Tucson, and Cottonwood Recovery.
3 Klearman was also asked to provide his standard fee agreement and terms and conditions.
4 On September 15, 2008, Klearman sent Welch an email, attaching, among other documents,
5 the Seller's Authorization and Exclusive Fee Agreement ("Agreement"), the Standard Terms
6 and Conditions to CFA Fee Agreements ("Terms and Conditions"), and a proposal for M&A
7 advisory services. Welch proposed changes to the Agreement, but neither Klearman nor
8 Welch mentioned the Terms and Conditions in their negotiations of the terms of the
9 Agreement.[1] On October 10, 2008, Welch signed the Agreement on behalf of Cottonwood
10 and sent it back to Klearman via email. Upon receiving Welch's signature, Klearman
11 countersigned the Agreement.

Pursuant to the Agreement, Cottonwood engaged Klearman on an exclusive basis "to assist [Cottonwood] and/or its shareholders, principals, subsidiaries, partnerships and other related parties (Affiliates) to accomplish a sale, merger, exchange, capital investment, loan, joint venture or other such transaction involving all or part of the business interest of [Cottonwood], including but not limited to, stock and assets owned directly or indirectly by [Cottonwood] or Affiliates described generally as follows: Cottonwood Centers, Inc. and subsidiaries." Klearman Decl. ¶ 7, Exhibit D, p. 1 (Doc. 14-2).

The Agreement provides that Klearman is entitled to receive a commission of "4% of the balance of the total Consideration" of any transaction consummated under the Agreement, and that Cottonwood's "fee obligation to Consultant shall survive this Agreement for Transactions with parties contacted or with whom discussions and/or negotiations were initiated during its term . . . " *Id.* at p. 2. The Agreement also states that it "shall remain in effect for fifteen months from [the date of signature] and shall continue

---

[1]During oral argument, Defense Ex. F was admitted for purposes of the pending motion. Defense Ex. F shows Welch proposed changes to the Agreement.

thereafter until terminated by either party upon 30 days prior written notice." *Id.* The Agreement states that the "attached Standard Terms and Conditions are incorporated into this Agreement." *Id.* at p. 2. The copy of the Terms and Conditions provided by the Klearmans provides that it is "incorporated into the client fee agreement[.]" Klearman Decl. at ¶ 9; Exhibit E. The Terms and Conditions includes:

> Arbitration: Any controversy, dispute, or claim between the parties relating to this Agreement shall be resolved by binding arbitration in accordance with the rules of the American Arbitration Association.

*Id.* Klearman also asserts that Welch did not complain to Klearman about the arbitration clause or "otherwise question, object to, or in any way attempt to modify or negotiate the Terms and Conditions." Klearman Supp. Decl., ¶ 3 (Doc. 23-1).

Cottonwood asserts, however, that the Terms and Conditions is unsigned and incomplete and was not part of the commission agreement. Specifically, Welch asserts that Klearman sent him a number of documents, including a blank form entitled Standard Terms and Conditions to CFA Fee Agreements. The form was blank as to date, governing law, and client initials. Welch asserts the document was not addressed in any subsequent negotiations with Klearman and that Welch did not initial, sign, or otherwise approve of or agree to the form. Welch also asserts that nothing was attached to the document that he did sign (i.e., the Agreement). Welch does not specifically state when he opened the Terms and Conditions email attachment or when he became aware of the provisions included within the Terms and Conditions. Additionally, Cottonwood points out that the copy provided by the Klearmans omits the blank "Client Initials: _____" provision that was included on the form submitted to Cottonwood but not accepted by Cottonwood.[2]

---

[2]Indeed, Cottonwood has objected to this exhibit submitted by the Klearmans as incomplete and as to foundation. However, the Klearmans do not dispute Cottonwood's assertion the form was blank when it was sent to Welch. The Court finds the discrepancies of this document go to the weight rather than its admissibility and overrules the objection. *See e.g., Marceau v. International Broth. of Elec. Workers*, 618 F.Supp.2d 1127, 1141-42 (D.Ariz. 2009) ("at the summary judgment stage, courts do not focus on the admissibility of

- 3 -

In early 2018, Cottonwood's assets were acquired by a company called Summit BHC Tucson, LLC ("Summit"). Cottonwood asserts it employed and paid a Scottsdale broker in connection with the Summit sale. The Klearmans assert the principals of Summit were introduced to Cottonwood by Klearman in 2009. Cottonwood asserts Klearman did not introduce Summit to Cottonwood and did not have anything to do with the sale. Cottonwood asserts Klearman learned of the sale after the fact and then made a claim for a commission.

Cottonwood asserts the 2008 commission agreement was terminated in 2011. In 2011, Cottonwood took its property off the market. Cottonwood asserts it terminated the CFA commission agreement by making a $75,000 payment to Klearman, who accepted the payment. Welch Decl., Exs. 1 and 1-B (Doc. 22-1). Welch asserts Klearman rendered no further brokerage services to Cottonwood. Welch Decl., ¶ 5 (Doc. 22-1). The Klearmans assert, however, that Klearman has:

> devoted considerable time and resources identifying and presenting potential buyers; preparing marketing materials, presentations and other documents describing the transaction; participating in discussions and negotiations with Plaintiff and prospective buyers; bringing several indications and letters of interest; working with Plaintiff's attorneys, accountants and representatives; and otherwise assisting Plaintiff to bring a potential transaction to a close.

Klearman Decl. ¶ 11 (Doc. 14-2). Further, the Klearmans assert Klearman remained in constant communication with Cottonwood, primarily with Welch, regarding his progress. The Klearmans also state neither Cottonwood nor its representatives ever suggested, indicated, or represented to Klearman that Cottonwood was terminating the Agreement or that he was to stop performing services for Cottonwood under it. *Id.* Indeed, Klearman asserts he continued to introduce prospective clients to Cottonwood, fielded at least one call from a prospective buyer, and researched and presented the concept of a sale to an Employee Stock Ownership Program. Klearman Supp. Decl., ¶ 4 (Doc. 23-1). Further, Klearman asserts that the $75,000 check was not intended to be a final payment upon termination of

---

the evidence's form. [Courts] instead focus on the admissibility of its contents").

- 4 -

the Agreement, but was a progress payment for Klearman to continue work on behalf of Cottonwood. *Id.* at ¶ 4.

Pursuant to the Agreement, Klearman claimed his 4% commission on the transaction.[3] Cottonwood refused to pay Klearman his claimed commission.

On April 27, 2018, rather than initiating arbitration of this dispute, Cottonwood filed an action against Klearman in the Arizona Superior Court in and for the County of Pima, Case No. C20182084, seeking a declaration that there is no agreement to arbitrate between the parties. Klearman removed the action to this Court. On May 23, 2018, Cottonwood filed an Amended Complaint against Defendants Corporate Finance Associates Worldwide, Inc. ("CFA Worldwide") and the Klearmans.[4] Cottonwood seeks declaration of the rights and obligations of the parties with respect to the controversy including a declaration that Cottonwood is not bound to arbitrate Klearman's claim for a brokerage commission and that Cottonwood does not owe any Defendant a brokerage commission.

The Klearmans filed a Motion to Dismiss and Compel Arbitration, or, Alternatively, Stay the Action ("Motion") (Doc. 14). The Klearmans assert Cottonwood and Klearman signed a valid and binding agreement to arbitrate "'[a]ny controversy, dispute, or claim between the parties relating to any claims arising out of" the parties' Seller's Authorization and Exclusive Fee Agreement ("Agreement")." Motion (Doc. 14, p. 2).[5] The Klearmans assert the Court must order the parties to arbitration and should dismiss this action.

---

[3]The commission is believed to be valued in the range of $10-$15 million.

[4]Cottonwood alleges that Sheryl Klearman is joined as a party defendant because her husband presumptively acted for and on behalf of the marital community. Cottonwood subsequently voluntarily dismissed CFA Worldwide (Doc. 25).

[5]*See e.g. Sun Valley Ranch 308 Ltd. Partnership ex rel. Englewood Properties*, 231 Ariz. 287, 294 P.3d 125 (App. 2012) (discussing broad arbitration clause which includes requirement of arbitration where controversy or dispute arises out of or relates to an agreement). *Sun Valley Ranch 308 Ltd. Partnership ex rel. Englewood Properties*, 231 Ariz. 287, 294 P.3d 125 (App. 2012).

Cottonwood filed an Opposition to the Motion and a Cross-Motion for Declaratory Relief ("Response") (Doc. 22). Cottonwood asserts the "separate unsigned and incomplete document that contains an arbitration provision (Defs' Ex. E) was not part of the commission agreement." Response (Doc. 22, p. 2). Cottonwood also asserts that the Klearmans have submitted an incomplete photocopy of the Standard Terms and Conditions to CFA Fee Agreements. Motion (Doc. 14, Ex. E) and Response (Doc. 22, Ex. 1-A).

Cottonwood and the Klearmans have also filed replies. (Docs. 23 and 24).

*The Agreement, the Terms and Conditions, and Arbitration Clause*

The Federal Arbitration Act ("FAA") was enacted to "overcome courts' reluctance to enforce arbitration agreements." *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 892 (9th Cir. 2002). The FAA reverses "the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). The Ninth Circuit has summarized:

> Under the Federal Arbitration Act, a district court's role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). A court may "decide as a matter of law that the parties did or did not enter into" an arbitration agreement "[o]nly when there is no genuine issue of fact concerning the formation of the agreement." *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991) (citation omitted).

*Cunico Corp. v. Custom Alloy Corp.*, 668 F. App'x 777 (9th Cir. 2016).

Arizona recognizes "a strong public policy, both federal and state, favoring arbitration." *Cooper v. QC Financial Services, Inc.*, 503 F.Supp.2d 1266, 1289 (D.Ariz. 2007), *citations omitted*. While Arizona law favors arbitration, "it is more accurate to say that the law favors arbitration of disputes that the parties have agreed to arbitrate." *Southern Cal. Edison Co. v. Peabody Western Coal Co.*, 194 Ariz. 47, 51, 977 P.2d 769, 773 (1999). Pursuant to the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable,

- 6 -

save upon such grounds that exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Moreover, "[c]ourts should not assume an overly paternalistic attitude toward the parties to a contract by relieving one or another of them of the consequences of what is at worst a bad bargain[.]" *Nelson v. Rice*, 198 Ariz. 563, 568, 12 P.3d 238, 243 (App. 2000), *quoting Pacific Am. Leasing*, 152 Ariz. 96, 103, 730 P.2d 273, 280 (App. 1986).

Pursuant to 9 U.S.C. § 4, the Court applies a standard similar to that applicable for a motion for summary judgment. *Par-Knit Mills v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 n. 9 (3d Cir.1980); *see also The O.N. Equity Sales Co. v. Thiers*, 590 F. Supp. 2d 1208, 1211 (D. Ariz. 2008) ("The standard the court applies in making the arbitrability determination is similar to the summary judgment standard, and the court should review the record to determine if the party opposing arbitration has raised any triable issue of fact.") (citing *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)). Where the making of the arbitration agreement is in issue, a court "shall proceed summarily to the trial thereof." 9 U.S.C. § 4.

In this case, the parties dispute whether the Standard Terms and Conditions are incorporated into the Agreement of the parties. Klearman asserts that Welch contacted him seeking a proposal regarding Klearman's possible assistance to Cottonwood in the sale of all or a portion of Cottonwood's behavioral healthcare company known as Cottonwood Centers, Cottonwood de Tucson, and Cottonwood Recovery; Klearman was also asked to provide his standard fee agreement and terms and conditions. Klearman asserts he sent Welch an email, attaching, among other documents, the Agreement, the Terms and Conditions, and a proposal for M&A advisory services. Klearman points out that Welch signed the Agreement on behalf of Cottonwood and sent it back to Klearman via email. Upon receiving Welch's signature, Klearman countersigned the Agreement.

Welch asserts that Klearman sent him a number of documents, including a blank form entitled Standard Terms and Conditions to CFA Fee Agreements. Welch asserts this document was not addressed in any subsequent negotiations with Klearman and that Welch

did not initial, sign, or otherwise approve of or agree to the form. Welch also asserts that nothing was attached to the Agreement, the document that Welch did sign.

The material facts regarding the signing of the Agreement and the inclusion of the Terms and Conditions in the email are not disputed.

The Klearmans argue that *Edwards v. Vemma Nutrition Co.*, 2018 WL 637382 (D. Ariz. Jan. 31, 2018), is dispositive. While this decision may provide guidance, it does not offer either binding or persuasive precedent. *See e.g. People of Territory of Guam v. Yang*, 800 F.2d 945, 949 (9th Cir. 1986) ("The law is clear that an unpublished district court decision has no precedential authority.").

Incorporation of a separate document and agreement requires the "the reference must be clear and unequivocal and must be called to the attention of the other party, [the other party] must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties. *United California Bank v. Prudential Ins. Co. of Am.*, 140 Ariz. 238, 268 (App. 1983); *see also Edwards*, 2018 WL 637382 at *3-4.

In *Edwards*, the agreement provided that the party had "carefully reviewed, understand[s], and agree[s] to abide by [Vemma's] marketing plan and policies and procedures, and acknowledge[s] that they are incorporated as part of this agreement[.]" *Id.* at 3. Moreover, the marketing plan and policies and procedures (which included an arbitration clause) were easily available. In this case, the Terms and Conditions were also easily available. However, the Court finds *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014), more instructive than *Edwards*. In *Nguyen*, the Ninth Circuit determined that a browsewrap agreement did not provide actual notice of the Terms of Use.[6] The court stated:

---

[6]"[A] browsewrap agreement does not require the user to manifest assent to the terms and conditions expressly . . . [a] party instead gives his assent simply by using the website." *Nguyen*, 763 F.3d at 1176 (quoting *Hines v. Overstock.com, Inc.*, 668 F.Supp.2d 362, 366–67 (E.D.N.Y.2009)).

> But where, as here, there is no evidence that the website user had actual knowledge of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract. [*Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 30-31(2d Cir.2002) (applying California law)]; *see also In re Zappos.com, Inc. Customer Data Sec. Breach Litig.*, 893 F.Supp.2d 1058, 1064 (D.Nev. 2012). Whether a user has inquiry notice of a browsewrap agreement, in turn, depends on the design and content of the website and the agreement's webpage. [*Be In, Inc. v. Google Inc.*, No. 12–CV–03373–LHK, 2013 WL 5568706, at *6 (N.D.Cal. Oct. 9, 2013)]. Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement. *See, e.g., Specht*, 306 F.3d at 23 (refusing to enforce terms of use that "would have become visible to plaintiffs only if they had scrolled down to the next screen"); *In re Zappos.com*, 893 F.Supp.2d at 1064 ("The Terms of Use is inconspicuous, buried in the middle to bottom of every Zappos.com webpage among many other links, and the website never directs a user to the Terms of Use."); [*Van Tassell v. United Mktg. Grp., LLC*, 795 F.Supp.2d 770, 790 (N.D.Ill.2011)] (refusing to enforce arbitration clause in browsewrap agreement that was only noticeable after a "multi-step process" of clicking through non-obvious links); [*Hines v. Overstock.com, Inc.*, 668 F.Supp.2d 362, 367 (E.D.N.Y.2009)] (plaintiff "could not even see the link to [the terms and conditions] without scrolling down to the bottom of the screen—an action that was not required to effectuate her purchase"). On the other hand, where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap agreements. *See, e.g., Cairo, Inc. v. Crossmedia Servs., Inc.*, No. 04–04825, 2005 WL 756610, at *2, *4–5 (N.D.Cal. Apr. 1, 2005) (enforcing forum selection clause in website's terms of use where every page on the website had a textual notice that read: "By continuing past this page and/or using this site, you agree to abide by the Terms of Use for this site, which prohibit commercial use of any information on this site"). *But see Pollstar v. Gigmania, Ltd.*, 170 F.Supp.2d 974, 981 (E.D.Cal.2000) (refusing to enforce browsewrap agreement where textual notice appeared in small gray print against a gray background). In short, the conspicuousness and placement of the "Terms of Use" hyperlink, other notices given to users of the terms of use, and the website's general design all contribute to whether a reasonably prudent user would have inquiry notice of a browsewrap agreement.

*Nguyen*, 763 F.3d at 1177. Here, although the reference in the Agreement refers to an attached document, the Terms and Conditions were not physically attached to the Agreement, but was one of multiple attachments to an email. The provisions of the Terms and Conditions were not accessible unless Welch viewed the other attachments to the email – and there is no evidence before the Court that he did so prior to the signing of the Agreement. In other words, Welch could not view the provisions of the Terms and Conditions without opening a separate document – an action that was not required to sign the Agreement.

Additionally, unlike in *Edwards*, there is no acknowledgment of the incorporation which would clearly indicate Cottonwood's consent. While the Court generally agrees with

the Klearmans that the Terms and Conditions would not necessarily have to have been initialed, the failure to do so in this case (where the form was not physically attached to the Agreement and the form included an initial line) indicates a *lack* of consent. Further, it is not clear that the reference had been called to the attention of Cottonwood or Welch. Rather, Klearman states that the email included five documents – there was nothing to specifically draw Welch's attention to the Terms and Conditions or the incorporation reference. Indeed, Klearman's email summarizes the documents attached to the email and then states that he looks forward to discussing next steps with Welch. Motion to Dismiss, Ex. B (Doc. 14-2). The email itself does not include any language that Klearman intended the Terms and Conditions to be attached to the Agreement. Although Welch's proposed modifications of the Agreement, Def. Ex. F, indicate Welch was engaged and focused on the terms of the Agreement, there is no similar evidence as to the Terms and Conditions. Indeed, there is no evidence that any subsequent modified Agreement ever had the Terms and Conditions attached to it. Further, Klearman did not take any action which would indicate Klearman believed the Terms and Conditions would be binding, e.g., include the state of jurisdiction.

The Court finds there is insufficient evidence that Welch had actual knowledge of the provisions of the Terms and Conditions, including the arbitration agreement. Neither the email nor the Agreement put a reasonably prudent person on notice of the provisions of the Terms and Conditions. The Court finds the parties did not enter into a valid agreement to arbitrate.

*Cottonwood's Request for Declaratory Relief*

Cottonwood requests this Court enter an order declaring Cottonwood is not bound to arbitrate the Klearmans' claim for a brokerage commission and Cottonwood does not owe the Klearmans a brokerage commission on the sale to Summit. The Court will grant the request as to Cottonwood's first request, i.e., that it is not bound to arbitrate the Klearmans' claim for a brokerage commission. However, Cottonwood's second request appears to be

asking the Court to summarily resolve a possible breach of contract claim. Neither party has alleged a breach of contract claim, nor have the parties conducted discovery or had an opportunity to submit a summary judgment motion as to such a claim.[7] "Although the availability of alternative remedies is not a bar to declaratory relief, Fed.R.Civ.P. 57, the district court may in its discretion refuse declaratory relief if the alternative remedy is more appropriate." *In re Young*, No. EDCV 11-1626-GW, 2012 WL 5832431, at *7, n. 16 (C.D. Cal. Nov. 13, 2012) (quoting *Smith v. Metropolitan Property & Ins. Co.*, 629 F.2d 757, 759 (8th Cir. 1980)). Here, allowing the parties, if they so choose, to proceed with a breach of contract claim is a more appropriate remedy. *See e.g. Countrywide,* 642 F.3d at 852 (quoting *Snodgrass v. Provident Life & Accident Ins. Co.*, 147 F.3d 1163, 1167 (9th Cir. 1998) (The Declaratory Judgment Act "relaxes this obligation in cases where a party seeks declaratory relief." Therefore, "[i]n assessing actions for declaratory judgment, 'the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration.'") (citations omitted); *R.R. St. & Co. Inc. v. Transp. Ins. Co.*, 656 F.3d 966, 975 (9th Cir. 2011) (avoid "needless determination of state law issues"). The Court will deny this request for declaratory relief.

*Request for Attorney's Fees*

Cottonwood requests an award of attorney's fees pursuant to A.R.S. § 12-341.01. The Court will deny this request in this Order, but will direct Cottonwood to "file and serve a motion for award of attorneys' fees and related non-taxable expenses (along with a supporting memorandum of points and authorities) within fourteen (14) days of the entry of judgment[.]" LRCiv 54.2(b)(2).

---

[7]As no breach of contract claim has been alleged as a claim in this case, the Court declines to remand this matter to the state court.

- 11 -

Accordingly, IT IS ORDERED:

1. Defendants' Motion to Dismiss and Compel Arbitration, or, Alternatively, Stay the Action (Doc. 14) is DENIED.

2. Plaintiff's request for declaratory relief (Doc. 6) and Cross-Motion for Declaratory Relief (Doc. 22) are GRANTED IN PART AND DENIED IN PART.

3. Declaratory relief is granted in favor of Cottonwood and against Klearman. The Court declares Cottonwood is not bound to arbitrate the Klearmans' claim for a brokerage commission.

4. Cottonwood may "file and serve a motion for award of attorneys' fees and related non-taxable expenses (along with a supporting memorandum of points and authorities) within fourteen (14) days of the entry of judgment[.]" LRCiv 54.2(b)(2).

5. The Clerk of Court shall enter judgment and shall then close its file in this matter.

DATED this 17th day of October, 2018.

_____
Cindy K. Jorgenson
United States District Judge